IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MARIA WOODS | § | |
| | § | |
| V. | § | ACTION NO. 4:06-CV-525-Y |
| | § | |
| JOHN E. POTTER, POSTMASTER | § | |
| GENERAL, UNITED STATES | § | |
| POSTAL SERVICE | § | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Pending before the Court is Defendant's Motion for Summary Judgment [doc. # 57], filed January 22, 2008. For the following reasons, the Court GRANTS the motion.

### I. BACKGROUND

This case arises from plaintiff Maria Woods's termination from her job with the United States Postal Service ("the Postal Service"). Woods was a business-mail-entry analyst, and began working for the Postal Service in 1986. (Pl.'s App. at 3.) Woods's job involved analyzing business-mail entries to ensure the uniform acceptance, classification, verification, and release for dispatch of bulk mailings. (Def.'s App. at 54.) The job required prolonged periods of typing and driving. (Def.'s App. at 32.) In 2000, Woods received a government credit card. (Def.'s App. at 106.) The card was to be used "only for official travel and official travel-related expenses away from [Woods's] official station/duty station." (Def.'s App. at 60.) Woods was prohibited from using the credit card for "personal business." (Def.'s App. at 56.)

In 2002, Woods transferred to an office in Fort Worth, Texas, where H. W. Biesemeier was her supervisor. (Pl.'s App. at 3.) Later that year, Woods began to have numbness and pain in her hands, arms, elbows, and shoulders. (Pl.'s App. at 3.) In January 2003, Woods went to a

doctor because of these symptoms. (Def.'s App. at 3.) On February 12, Woods filed a complaint with the Department of Labor, stating that her job had caused her to suffer from carpal-tunnel syndrome. As a result, other clerks in her office began to assist her with her job duties. (Def.'s App. at 6.) Woods stated, however, that her carpal-tunnel syndrome had "minimal" impact on her ability to do her job. (Def.'s App. at 45.) Biesemeier was "negative" about Woods's problem and warned her that she would "regret it" if she had surgery on her hands. (Pl.'s App. at 3.) Before Woods left to have surgery addressing her carpal-tunnel syndrome, Biesemeier required Woods to remove her belongings from her office because "they were going to make room for other divisions, [Biesemeier] didn't know when they would be coming, but since [Woods] wasn't going to be there, if [Woods's] office was needed, it would already be packed up." (Pl.'s App. at 3; Def.'s Reply App. at 21-22.)

On June 4, 2004, Dr. Robert Ippolito performed surgery on Woods's right wrist to alleviate her carpal-tunnel symptoms. Dr. Ippolito operated on her left wrist on September 27. (Def.'s App. at 33.) On November 9, Dr. Ippolito stated to the Department of Labor that Woods could return to work for four hours a day for two weeks. After two weeks, Woods could resume eight-hour work days. However, Dr. Ippolito restricted Woods's activities by stating she could not type, could file only for a total of one hour a day, could drive for no more than one hour a day, could perform limited pushing and pulling, and could not lift over ten pounds. (Def.'s App. at 33.) These restrictions were expected to last two to three months.

The next day, the Postal Service offered Woods a modified job assignment that met Dr. Ippolito's restrictions. (Def.'s App. at 141.) On November 14, Woods declined the job offer because she needed to confer with Dr. Ippolito at her next appointment on November 16. (Def.'s App. at 93.) Because the Postal Service had requested that she see an independent

doctor, Woods also saw Dr. Walter Sorokolit on November 16 for an examination to determine her fitness to return to duty. Dr. Sorokolit determined that Woods's carpal-tunnel syndrome had been resolved, but that she needed to have further tests to determine if she had ulnar nerve problems. (Def.'s App. at 143.) He did not believe that she needed voice-activated software at work. Dr. Sorokolit stated that Woods could return to light work duties that did not require repetitive movement of her wrist or heavy lifting. Dr. Ippolito stated that Woods could return to work to the proposed modified job assignment on December 7 for four hours per day. (Def.'s App. at 150.) Woods did not return to work on December 7. (Def.'s App. at 109.) On December 16, after examining Woods, Dr. Ippolito stated that Woods could return to work in four weeks. Later, Dr. Ippolito determined that Woods could return to work on January 3, 2005. (Pl.'s App. at 4.)

Meanwhile, Thomas Andrews, the credit-card coordinator for the Fort Worth office of the Postal Service, began reviewing Woods's credit-card statements as part of his normal duties.[1] (Def.'s App. at 157-58.) Andrews noticed that Woods had several cash advances on her October 2004 statement. After looking at Woods's credit-card statements from January 2003 to November 2004, Andrews found multiple cash advances for thousands of dollars, which were not justified by Woods's minimal work-related travel during that period. Indeed, Woods's travel stopped completely in March 2004. After discussing his findings with Joe George, the financial manager for the Fort Worth office, Andrews forwarded the information to the Office of the Inspector General ("OIG"). On December 20, 2004, OIG agents interviewed Woods at her home

---

[1] Andrews first began to review Woods's statements in October 2004 because her records were not forwarded to the Fort Worth office until September 2004. It appears the delay in transferring Woods's documentation was the result of bureaucratic confusion.

3

about the cash advances. Woods admitted that she had used the credit card for personal matters because of her financial difficulties. (Def.'s App. at 65.) The agents then submitted a report, finding that of Woods's 55 transactions, only one was associated with official travel and the other cash advances totaled more than $8,350.

Woods returned to work on January 3, 2005. Woods claims that "the accommodations that had been ordered by Dr. Ippolito had not been made." (Pl.'s App. at 4.) Although Biesemeier was not at work that day, Woods had a pre-disciplinary meeting with George; Donna Kinsel, the labor-relations manager; and LuAnn Higbee, the acting manager of marketing; about her use of the credit card. Pending further investigation, Woods was "placed off the clock" until Biesemeier returned to work. (Def.'s App. at 132.) Two days later, Woods and her union representative, Jim Freeman, met with Biesemeier, Higbee, and J.B. Reeves, a labor-relations specialist. Although Woods did not dispute the accuracy of the OIG report and agreed her conduct was wrong, she refused to resign based on her years of service. (Def.'s App. at 25, 132.) Woods continues to admit that she abused the credit card in violation of the Postal Service's policy. (Pl.'s Resp. at 3.) On January 11, Biesemeier submitted the required paperwork to begin the formal process of firing Woods. (Def.'s App. at 133.) Biesemeier told Woods that he did not want to recommend her for removal and admitted that his fondness for Woods made it difficult to make the decision. (Pl.'s App. at 4; Def.'s App. at 132.) As part of the process, Woods was notified that, by January 21, she could request mediation or answer the proposed removal to the deciding official—David E. Roloff, the senior manager for the Fort Worth office. (Def.'s App. at 138-40.)

On March 11, Woods filed a complaint with the Equal Employment Opportunity Commission ("the EEOC"), alleging she had been discriminated against by George, Biesemeier,

and Higbee because of her race, color, sex, and disability.² The disability Woods listed was "carpal tunnel."³ (Def.'s App. at 37.) In other words, Woods asserted that she had been fired when whites and men who had violated the credit-card policy were not fired. She also believed that her credit-card abuse became an issue only after her disability occurred. (Def.'s App. at 46-47.) In answering the EEOC's subsequent investigative questionnaire, Woods stated that her disability limited her lifting and sleeping, but stated that it had a "minimal" impact on the performance of her job. (Def.'s App. at 44-45.) On April 22, Roloff issued a notice of removal after meeting with Woods and her union representative. Roloff found the charges against Woods to be supported and sufficient cause for removal:

> The penalty assessed [removal] is commensurate with the penalty imposed in similar circumstances. There are no similarly situated employees in this regard. No other employee who has been disciplined for misuse of a government credit card did so with the intent, or the sheer number of incidents that you committed during a period of more than a year.

(Def.'s App. at 91.) On April 28, 2006, the EEOC sent Woods notice that it had "terminated its proceedings in relation to [Woods's] charges." (Comp. at 2.)

On July 31, Woods filed suit against defendant John E. Potter, the postmaster general of the Postal Service ("Potter") for violations of Title VII and the Rehabilitation Act for improperly firing her on the basis of her race, gender, or disability. *See* 29 U.S.C.A. § 794(a) (West Supp. 2007); 42 U.S.C.A. § 2000e-2(a)(1) (West 2003). In his motion for summary judgment, Potter asserts that he is entitled to judgment as a matter of law because Woods has failed to state a

---

²Woods is a black female.

³Woods now argues that she was also discriminated against based on her disabilities of cubital-tunnel syndrome, ulnar neuropathy, cervical stenosis, and depression. (Pl.'s Resp. at 1, 15.) However, she did not properly raise these disabilities before the EEOC; thus, they are not exhausted, and this Court will not consider them in determining discrimination.

5

prima-facie case of discrimination, Potter had a legitimate, nondiscriminatory reason for firing Woods, and Woods has not shown that Potter's reasons for firing her were a pretext for unlawful discrimination.

## II. DISCUSSION

### A. SUMMARY-JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not produce evidence showing the absence of an issue of fact with respect to an issue on which the nonmovant bears the burden of proof, however. Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim. *See id.* at 323-25.

When the moving party has carried its summary-judgment burden, the nonmovant must go beyond the pleadings and by her own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

6

In making its determination on the motion, the Court must look at the full record in the case. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

B. TITLE VII

Under Title VII, it unlawful for an employer to discriminate against an employee on the basis of that employee's race or gender. *See* 42 U.S.C. § 2000e-2(a)(1). Discrimination claims based upon circumstantial evidence, such as this one, are evaluated under a burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). First, the plaintiff must establish a prima-facie case of discrimination. *See Haynes v. Pennzoil Co.*, 207 F.3d 296, 300 (5th Cir. 2002). If the plaintiff establishes a prima-facie case, then a presumption of discrimination arises and the burden shifts to the defendant to articulate—but not prove—a legitimate nondiscriminatory reason for the adverse employment action.[4] *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001). If the defendant meets its burden of production, then the presumption of intentional discrimination is rebutted and the burden shifts back to the plaintiff to show that the reason proffered by the

---

[4]"It is important to note . . . that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

defendant is merely a pretext[5] for racial discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Evans*, 246 F.3d at 350.[6]

Thus, the first issue is whether Woods has presented a prima-facie case of racial and gender discrimination. To that end in this work-rule-violation case, Woods must produce probative evidence tending to show that (1) she is a member of a protected group, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) employees not belonging to her protected class were treated differently under nearly identical circumstances to hers. *See Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Byers v. Dallas Morning News*, 209 F.3d 419, 426 (5th Cir. 2000); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995). Potter does not dispute that Woods has met the first three elements, but asserts that she has failed to produce sufficient (or, more precisely, any) evidence of the fourth, and equally essential element of her claim: that persons similarly situated were treated more favorably. (Def.'s Mot. for Summ. J. at 21-22.)

To satisfy this requirement Woods must show that Potter gave preferential treatment to employees outside her protected class under "nearly identical circumstances." *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). This necessity of "nearly identical" proof is an exacting one:

---

[5] Plaintiffs may show pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256-57.

[6] As the Supreme Court acknowledged, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false" may be sufficient for the finder of fact to infer discrimination. *See Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 148 (2000). The Supreme Court has also made it clear, however, that "instances [exist] where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*

> The prerequisite that a plaintiff show 'nearly identical' circumstances rather than merely have 'similar circumstances' is not satisfied when the allegedly comparable employees hold different jobs, have different supervisors, are subject to different standards, engage in different conduct resulting in disciplinary action, engage in a higher number of actions that violate the employer's policies or engage in more serious misconduct.

*Tolliver v. City of Dallas*, No. 3:96-CV-2629-D, 1998 U.S. Dist. LEXIS 872552, at *27 (N.D. Tex. Sept. 30, 1998); *see also Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001). Woods asserts that the issue of "similarly situated" employees should not be looked at in determining whether she has made a prima-facie case of discrimination under Title VII. (Pl.'s Resp. at 13-14.) However, Potter convincingly argues that such evidence is a integral part of Woods's prima-facie case. (Def.'s Reply at 4-5.) *See, e.g., Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514-15 (5th Cir. 2001) (analyzing whether other employees' violations were "nearly identical" to determine occurrence of racial and national-origin discrimination). Woods also argues that Potter's search for similarly situated employees was "too narrow." (Pl.'s Resp. at 13.) However, the magistrate judge ruled that Woods's discovery requests on this issue were limited to employee discipline for employees at the same pay-grade level or within one level of Woods's level and who used their government credit cards for personal reasons. (Sept. 18, 2007 Order.) Woods did not ask this Court to review the magistrate judge's determination; thus, Woods cannot now complain of the scope of Potter's production. *See* 28 U.S.C.A. § 636(b)(1)(A) (West 2006); FED. R. CIV. P. 72(a).

Nevertheless, Woods asserts that she "has presented summary judgment evidence [that] establishes that employees not in her protected class—males and Caucasians—violated the policy on nonofficial use of credit cards and were not discharged." (Pl.'s Resp. at 13.) Andrews and Kinsel stated that they had never seen such an egregious abuse of a government credit card

as they saw in Woods's case. (Def.'s App. at 156, 195.) Woods's evidence comes down to four employees who were identified by Potter in his discovery responses as employees who were disciplined for credit-card abuse: Melvin L. Russell, a mechanic; Naomi Lawrence, a postmaster; Dave Powell, a postmaster; and Billy Scott, a customer-service supervisor. (Pl.'s App. at 83-84.) Woods does not proffer evidence of the race of these employees, the severity of their violations, or the discipline received. Woods also points this Court to Biesemeier's deposition in which he gave two instances of employee discipline related to government credit card abuse: (1) in 1993, he disciplined a "mailing standard specialist" for "an incident of buying dinner with her credit card" by revoking her government credit card and (2) in 2001, he recommended that a "person" be suspended for three weeks when he did not pay his credit card in a timely manner after being reimbursed for business travel. (Pl.'s App. at 190, 194, 196.) Woods has proffered no evidence that these employees were of a different race, at the same or similar pay grade as Woods, or that the offenses were similar to Woods's. Evidence of "nearly identical" circumstances is crucial to a Title VII discrimination suit, and the lack of it is fatal to such claim. *See, e.g., Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (discussing cases holding identical circumstances cannot be found unless the misconduct was nearly identical). Woods has not produced a single instance of an employee who used his government credit card to obtain multiple cash advances in the thousands of dollars and who was disciplined less severely. Further, there is no evidence that these employees were in similar positions in the Postal Service

or outside Woods's protected class. Thus, Woods, having failed to raise a genuine issue of fact as to the fourth essential element of her claim, has failed to present a prima-facie case.[7]

C. THE REHABILITATION ACT

The Rehabilitation Act prohibits discrimination against qualified individuals who have a disability and who work in programs that receive federal funds, such as the Postal Service. *See* 29 U.S.C.A. § 794(a). The applicable standards to determine the existence of a violation are those stated under the Americans with Disabilities Act. *See id.* § 794(d) (West 1999). To establish a prima-facie case of disability discrimination, a plaintiff must show that she (1) is an individual with a disability, (2) is otherwise qualified to perform the job, (3) was employed in a program or activity that is federally funded, and (4) was discriminated against solely because of her disability. *See Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997).[8] Once a prima-facie case is shown, this Court must apply the *McDonnell Douglas* analysis discussed above. *See Burciaga v. West*, 996 F. Supp. 628, 634 (W.D. Tex. 1998).

Once again, this Court first must focus on whether Woods has established a prima-facie case of disability discrimination. Specifically, this Court's inquiry is whether Woods has shown that she is an individual with a disability. A "qualified individual" is defined as:

> an individual . . . who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

---

[7] Because Woods has failed to show a prima-facie case, this Court need not determine whether Potter had a legitimate reason for firing Woods or whether that reason was pretextual. But even if Woods had established a prima-facie case, she has failed to show that Potter's articulated reason for firing her—abuse of her government credit card, which she does not dispute occurred—was a pretext. (Def.'s Mot. for Summ. J. at 36-37; Def.'s Reply at 15-21.)

[8] Potter does not dispute that Woods has met the third element, but challenges Woods's proof on the remaining three elements.

11

42 U.S.C.A. § 12111(8) (West 2005); *see also* 29 C.F.R. § 1630.2(m) (2006). An individual with a disability is one who (1) has a physical or mental impairment that substantially limits[9] one or more of the person's major life activities,[10] (2) has a record of such impairment, or (3) is regarded as having such an impairment. *See* 29 U.S.C.A. § 705(20)(B) (West 1999 & Supp. 2007); 45 C.F.R. § 84.3(j)(1) (2006); *see also* 42 U.S.C.A. § 12102(2) (West 2005) (ADA's similar definition of a disability); 29 C.F.R. § 1630.2(g) (2006) (same). These definitions create a "demanding standard" to qualify as disabled. *See Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 193 (2002).

Deciding whether Woods is an individual with a disability requires a two-prong inquiry: (1) does Woods have a physical or mental impairment and, if so, (2) does such impairment substantially limit one or more of Woods's major life activities? *See Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2$^d$ Cir. 1994). There is no per-se rule regarding whether carpal-tunnel syndrome is a disability, and such a determination must be made on a case-by-case basis. *See id.* at 198-99. In other words, the presence of carpal-tunnel syndrome does not, on its own, indicate whether the employee has a disability. *See id.*

It seems that the parties do not dispute that Woods's carpal-tunnel syndrome amounts to a physical impairment. Indeed, Woods and Potter solely focus on whether the impairment substantially limited one or more of Woods's major life activities. (Def.'s Mot. for Summ. J. at

---

[9] To be "substantially limited" means that an individual is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (2006).

[10] A "major life activity" is a function "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.4(j)(2)(ii); *see also* 29 C.F.R. § 1630.2(i) (2006). Lifting has also been held to be a major life activity. *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 n.7 (5th Cir. 1995).

24; Pl.'s Resp. at 15; Def.'s Reply at 9.)  Thus, this Court must now look to whether Woods's impairment substantially limits Woods in a major life activity.  In her affidavit to the EEOC, Woods stated that she was substantially limited in her ability to lift and sleep, but that the impact on her ability to work was "minimal." (Def.'s App. at 44-45.)  Further, Woods's carpal-tunnel syndrome was a temporary condition that was completely resolved by the surgeries. (Def.'s App. at 2.)  At the time Woods was fired, her doctors expected that the restrictions on her work would be temporary. (Def.'s App. at 33, 149.)  A temporary impairment that minimally impacts an employee's ability to work does not meet the demanding standard of being deemed disabled. *See Toyota Motor* 534 U.S. at 198 (holding impairment's impact must be "permanent or long term" to equate to a substantial limit).  Woods's impairment arguably only temporarily limited her from a narrow range of jobs and did not limit her from employment generally or from a broad range of jobs.  *See* 29 C.F.R. § 1630.2(j)(3)(i); *Hileman v. City of Dallas, Tex.*, 115 F.3d 352, 353 (5th Cir. 1997); *see also Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999). This is insufficient to raise a fact issue as to whether Woods's carpal-tunnel syndrome substantially limited her ability to work.  *See, e.g., Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998) (finding heavy-lifting restriction insufficient evidence of substantial limitation on major life activity).  This is especially true when Woods herself stated that her impairment "minimally" impacted her ability to work.

Woods also raises a disability-discrimination claim based on Potter's reluctance to accommodate her disability.  Specifically, Woods asserts that Potter failed to supply an ergonomically designed desk and chair when she returned to work. (Comp. at 5-6; Def.'s App. at 104.)  But as Potter points out, Woods failed to exhaust this claim before the EEOC. (Def.'s Mot. for Summ. J. at 32.)  *See Clayton v. Rumsfeld*, 106 Fed. Appx. 268, 271 (5th Cir. 2004).

Further, Woods has failed to proffer any evidence that an ergonomic desk and chair were required medically to facilitate her return to work or that Biesemeier was aware of this need. (Def.'s App. at 10, 126.) To the contrary, Potter offered Woods a modified work assignment, which she refused.

### III. CONCLUSION

Because Woods has failed to present a prima-facie case of discrimination under either Title VII or the Rehabilitation Act, Potter is entitled to judgment as a matter of law.[11]

SIGNED April 28, 2008.

*Terry R. Means*
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[11] This Court's August 2008 trial setting is CANCELED.